[Cite as *State v. Cressel*, 2014-Ohio-3353.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

STATE OF OHIO                                   :

    Plaintiff-Appellee                      :               C.A. CASE NO.    25979

v.                                              :               T.C. NO.    13CR1290

ALLEN T. CRESSEL                                :                 (Criminal appeal from
                                          Common Pleas Court)

    Defendant-Appellant                     :

                                                       :

. . . . . . . . . .

# **O P I N I O N**

Rendered on the 1st day of August, 2014.

. . . . . . . . . .

APRIL F. CAMPBELL, Atty. Reg. No. 0089541, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

BRYAN K. PENICK, Atty. Reg. No. 0071489, 1900 Kettering Tower, Dayton, Ohio 45423
        Attorney for Defendant-Appellant

. . . . . . . . . .

DONOVAN, J.

    **{¶ 1}**   This matter is before the Court on the Notice of Appeal of Allen Cressel,

filed

October 30, 2013. Cressel appeals from the trial court's October 29, 2013 judgment entry of conviction, issued following a trial by jury on one count of domestic violence (knowingly)(2 priors), in violation of R.C. 2919.25(A), a felony of the third degree. The victim herein is Cressel's girlfriend, Kristy G. (hereinafter "Kristy"). Cressel was sentenced to 24 months in prison. We hereby affirm the judgment of the trial court.

{¶ 2} Cressel was initially charged by way of complaint in Dayton Municipal Court on April 25, 2013. Following a preliminary hearing that occurred on May 6, 2013, the municipal court issued a Journal Entry finding that probable cause existed that Cressel committed the crime charged in the complaint, and remanding Cressel to the custody of the Sheriff to await the action of the Grand Jury. On May 30, 2013, Cressel filed a pro se "Motion for bond/ORC, Motion to Suppress, Motion to Dismiss, Motion to Discovery (sic) Petition for Bill of Particulars, Subpoena ducas tecum (sic), Appoint of assistance of counsel (sic)."

{¶ 3} On May 30, 2013, Cressel was indicted in the Montgomery County Court of Common Pleas, and on June 4, 2013, he entered a plea of not guilty. On July 5, 2013, appointed counsel for Cressel filed a motion to suppress, asserting that "Mr. Cressel argues if the State establishes that a *Miranda* warning was given and the accused made an uncoerced statement, this showing, standing alone, is insufficient to demonstrate 'a valid waiver' of *Miranda* rights. * * * The prosecution must make the additional showing that the accused understood these rights. * * *." The trial court overruled Cressel's motion on August 23, 2013, following a hearing. The court noted that Cressel was interviewed on April 29, 2013, by Detective Nathan Via, that he was in custody at the time, that he was advised of his constitutional rights, and that he waived those rights.

{¶ 4}    On September 20, 2013, the State filed a motion in limine, pursuant to Evidence Rule 609, "to prevent the defense from mentioning or eliciting evidence regarding State's Witness [Kristy's] prior Solicitation conviction * * * " in 2008.   Prior to the start of trial, the court granted the motion in limine as follows:

THE COURT: * * * In reading the Rule 609, it's clear that this is not a felony that would allow the admissibility of the conviction, nor does the Court find it to be a crime of * * * falsehood, which is also an exception.

Also, * * * I believe that the testimony would be irrelevant in this case.   The facts that have to be established against the Defendant, I believe, the issue of the victim being a - - or the alleged victim, being a prostitute, I guess is the allegation here, is irrelevant. * * *   I think the prejudicial effect of that does outweigh the probative value of this, based upon it doesn't fall in the criteria of 609. * * * .

{¶ 5}    The following exchange occurred after the court's ruling:

MR. PENICK: Two things from me, Judge.   One, in light of your rulings, excluding me - - from getting into the warrants and the - - the prostitute - - or solicitation conviction, I think there's some case law that says I need to bring that up again in a courtroom and then there needs to be an objection or - - or possibly the Defendant has waived.   I don't necessarily want to get into that argument in front of the jury and possibly cause some heartburn with the State or with the Court, obviously.   We have an agreement that if I don't get into that on the record that I'm not waiving that argument for purposes of perhaps this gentleman wants to appeal later.

THE COURT: I don't fully understand what you're saying, Mr. Penick, but anything that we say in here on the record is obviously subject to appeal.

MR. PENICK: Absolutely, Judge. But this is the case law that I've read is basically, motions in limine and the rulings that - - that go along with those are - - are just that. But it would be my duty then to - - to go ahead to start to ask the question and then have the State objection (sic) to it and if I never asked the question on the record during the trial then I think there's some authority that says I've waived that on behalf of the Defendant, and I don't want to waive those issues.

THE COURT: You're not waiving, Mr. Penick. And - - and that's a - - a dangerous thing to allow you to start to ask the question in front of a jury. So I - - I'm telling you for the record, that your record is secure. You have made the objection. It's not waived by you not asking the question or attempting to ask the question in the courtroom. I just don't want something improper to be said in front of the jury that the Court has ordered to be excluded, and I understand your position, but I'm making it clear for you on the record but - -

MR. PENICK: Yes sir.

THE COURT: - - I'm making it clear for you on the record that you're not waiving that objection.

* * *

MS. MADZEY: I think, Bryan, what - -what you're referring to the - - the proper thing to do would have been - - and maybe it's irrelevant now in light of the Court's ruling, but would be to approach and - - and renew your motion or renew your request to get into that, so that at the time that you wanted to get it but - -

THE COURT: And you believe - - if you believe that necessary, certainly we'd allow that. I just don't want you to - -

* * *

THE COURT: - - blurt out a question anticipating an objection - - MR. PENICK: True.

THE COURT: - - so if - - if it is in the area that you want to - - to restate it, please ask to approach, and I would allow you to do it at that point in time.

* * *

{¶ 6} At trial, Officer Harry Dilley of the Dayton Police Department testified that on April 21, 2013, he was working a shift from 3:00 p.m. to 11:00 p.m., and at approximately 3:15 p.m., he responded to 1720 Warner Avenue in Dayton, where Kristy was standing in front of an apartment complex with her uncle. Dilley testified that Kristy had a purple, raised bruise underneath her right eye, near her nose, and that she was "upset. She was crying off and on while I talked to her." Dilley stated that he "completed a domestic violence packet" with Kristy, photographed her injury, and issued a broadcast for Cressel. Dilley identified a photograph of Kristy taken by him that depicts bruising and swelling

around her right eye and a mark on her nose. Dilley stated that Kristy advised him that Cressel injured her at the Valero gas station at Troy and Valley Streets at approximately 1:00 p.m. Dilley stated that Kristy and Cressel had resided together for six months in Miamisburg on Hemple Road, and that they previously resided together on North Dixie Drive in Harrison Township.

{¶ 7} On cross-examination, Dilley testified it took him five minutes to respond to Warner Street. He stated that Kristy's uncle was not present when the incident occurred. He stated that Kristy advised him of a dispute between her and Cressel preceding her injury in which, while at the gas station, Cressel "tried to lift the hood up and she would sit on it." Dilley stated that Kristy advised him that the opening and closing of the hood occurred ten times. Dilley stated that Kristy provided a written statement. Dilley stated that Kristy advised him that after he punched her, Cressel got into another car that arrived at the gas station and left, and that the occupants of the vehicle may have witnessed the incident. According to Dilley, Kristy did not identify the occupants of the vehicle by name. Dilley stated that he did not respond to the Valero location to look for witnesses. Dilley stated that he learned from the computer in his cruiser that Cressel had previously been convicted of domestic violence.

{¶ 8} The following exchange occurred:

Q. Now, you do not have any special training that * * * allows you to identify when a particular bruise that you see on someone, when it happened, do you?

A. No.

Q.  So you can't look at a bruise and say, that happened two hours ago, or that happened 12 hours ago, or that happened four days ago; would you agree with me?

A.  I would agree.

Q.  So other than Ms.[Kristy] telling you that Mr. Cressel hit her, you don't really know how that bruise got there, do you?

A.  No.

Q.  Are you aware, sir, that prior to the incident that she's alleging with Mr. Cressel, that she had been in another altercation?

MS. MADZEY: Objection.

THE COURT: Sustained.

MR. PENICK: May we approach, Your Honor?

THE COURT: Yes.

(At sidebar)

MR. PENICK: If he's aware of that altercation, I think the jury needs to know that.

THE COURT: The way you ask it is getting into prior bad acts, which is something that I'm not allowing.  If you can somehow tie to this particular bruise in a timeframe, then I will allow it.

MR. PENICK: I can do that.  He may not even

know about the other incident.

MS. MADZEY: No, he doesn't.  He said that.

MR. PENICK: You don't know that.

MS. MADZEY: He just said no.

MR. PENICK: He didn't answer it.

THE COURT: Not the last question. I - - I ruled upon, but he says he doesn't know when a bruise would have occurred or what timeframe or whatever.

So, I don't know how you're going to get there, but I'm not going to allow it just to be opened to ask about prior bad acts. If there's something related to this particular bruise, that - - that he's aware of by another act that would have caused that, then I would allow that. So if you want to ask him that question, and depending on what he says, I may let you go further.

＊ ＊ ＊

BY MR. PENICK:

Q. The bruise that you observed on Ms. [Kristy] that we saw in the - - in the photograph?

A. Yes.

Q. Okay. Could have happened another time, correct?

A. Yes.

MS. MADZEY: Objection. Speculation.

THE COURT: Overruled.

THE WITNESS: Yes.

{¶ 9} On redirect examination, Dilley stated that when he came on duty on the

date of the incident, there was a shift change that causes response times to be delayed "[d]aily," and that "it all depends on if the suspect is on the scene or not, with the complainant." He stated that there was no indication that Cressel was on the scene with Kristy.

{¶ 10} Kristy testified that she is 32 years old, and that she resides on Ray Street with her two brothers. She stated that the Ray Street address is the former home of her deceased parents. Kristy stated that Cressel was her boyfriend, and that she has known him for five or six years. She stated that she and Cressel had been in an intimate relationship for "nine months or so" at the time of her injury. Kristy stated that she and Cressel were living together on Hemple Road on April 21, 2013, in a camper in the back yard of the home of Cressel's father. Kristy stated that she and Cressel had lived there for "a month or two," and that they previously resided in another camper at 4915 North Dixie Drive, in Harrison Township, at the L & H Auto Corral, which is owned by Cressel's uncle, Lee Hale. When asked when her "relationship evolved from somebody you know to somebody you're dating and living with," Kristy responded, "I hadn't seen him in a while and when we seen each other again, it just kind of went into boyfriend/girlfriend."

{¶ 11} Kristy stated that she knew Hale, and that Cressel would do odd jobs and "walk the lot" for him in exchange for staying in the trailer. Kristy described the camper as a small motor home, and she stated that "there was a microwave and the sink. The bed was to the left and up front there were two seats that just had junk piled on them." She stated that the camper did not have running water, and that she and Cressel "ran electricity to it" by means of an extension cord. She stated that the camper had a hotplate for cooking

purposes. According to Kristy, "some one was coming to get" the camper, and she moved everything she owned into the second camper and "pulled it with a truck out to Hemple Road." She stated that she spent every night at the camper. Kristy stated that she and Cressel would shower "at Mike Cooper's or his sister's, or I'd go to my brother's." According to Kristy, the second camper was "[w]ay in the back; behind the barn," at the Hemple Road address. She stated that she occasionally went into the home of Cressel's father to "have coffee, take a bath, things like that." She stated that Cressel's father was home "[m]ost of the time. If he wasn't there, his girlfriend, Kim, was there."

{¶ 12} Kristy stated that she and Cressel collected scrap metal for income and took it to First Street Recycling. She stated that the truck they used was initially registered to James Hodge, Cressel's cousin, and that the "tags were going to be coming up expired. So we put it in my name." She stated that they did so because, while the truck belonged to Cressel, he "has no driver's license." Kristy stated that the truck eventually broke down, and that her uncle "loaned me his mom's El Camino" for transportation and scrapping purposes. She stated that on April 21, 2013, she and Cressel were at the Valero gas station at Troy and Valley Streets, at about 1:00 p.m., when they got into an argument. The following exchange occurred:

Q. * * * Walk us through what happened at the Valero that day.

A. We got into an argument. Allen has a very bad temper. He gets upset and that's it.

* * *

A. He's - - he gets violent.

He was yelling and cussing at me. Then he went to - - he popped the hood on my uncle's El Camino and I would shut it back. He did that about three times. Then the third time is when he grabbed me by my arm and hit me.

* * *

A. In my eye.

{¶ 13} Kristy stated that she believed that Cressel was trying to remove the battery cables so that the truck would not run and she could not leave. She stated that she sat on the hood to prevent Cressel from taking the cables, and that after he hit her, she "started screaming, somebody call the police. Somebody help." She stated that Cressel hit her with a closed fist. Kristy stated that she was "dazed," and that her nose started bleeding. She stated that she called the police twice, and that they did not repsond. She stated that "[t]here was a lot of people there and they just ignored me." According to Kristy, after "Allen had hit me, a car full - - there was a car that pulled up and said, Cressel, come on. Let's go before the police come. He ran, jumped in the car. They took off."

{¶ 14} According to Kristy, "after that, I jumped in the car. I was hoping that it would start. It started and I thought, well, I'm going to get out of here before he comes back. So I left from the gas station, drove up to Warner Avenue and called the police again." Regarding her initial calls to the police, Kristy stated that she called 911 the first time and 3-3-3-COPS the second time. Kristy stated that the police did not respond to Warner Avenue until "[a]fter my aunt and uncle came and she called the police, they finally did come." In addition to a black eye, Kristy stated that she "had finger bruises on my arm from where he grabbed me." Kristy stated that the bruise on her face lasted several days,

and that the bruises on her arm lasted a week. She stated that she provided a written statement, and that she was interviewed subsequently by Detective Via.

{¶ 15} Kristy identified, as Exhibit 8, the title to the 1978 truck in her name which lists Ray Street as her address. She testified, "[t]hat's the address I've always used for my mail, mailing address." She also identified, as State's Exhibit 9, the registration to the truck, as well as the affidavit for registration which lists the Ray Street address.

{¶ 16} On cross-examination, the following exchange occurred:

Q. Now, Ms. [Kristy], let's be honest with the jury here. You're - - you're no angel, are you?

A. No. Never said I was.

Q. * * * Now, let's talk about your memory as far as this incident is concerned. Do you remember everything that happened?

A. Not everything in detail. No.

Q. * * * Do you remember about that timeframe? Is there anything going on with your memory that - - that may cause you to remember certain details?

A. I mean, I remember it. Yeah, I remember it.

Q. Anything about your memory that would cause you to give different stories to different people?

A. In - - they may have been slightly different, but they're - -

Q. So as you sit here today and testify, do you think you have any problems about recalling the events that took place on April 21st, 2013?

A.   No, sir.

{¶ 17}    Kristy stated that she knew Cressel "[f]rom the neighborhood," and that she became his girlfriend in August, 2012. She denied receiving money from Cressel to be intimate with him, and she denied being intimate with "some other gentlemen" during her nine month relationship with Cressel.   Kristy stated that Cressel's father observed her on the Hemple Road property. She stated that she did not know the specific address on Hemple Road because "I do not use it as my mailing address."   Regarding the money they made from scrap metal, Kristy stated that sometimes Cressel would "save it; sometimes he's spend it." (Sic).   She stated that Cressel "controlled the money."   She stated that she and Cressel would "go out to eat, we'd drink.  Different things."   Kristy stated that she drinks beer a couple "times a week."   Kristy stated that she did not pay rent while they lived at the car lot, and that Hale knew that they were occupying the camper.   Regarding the camper on Hemple Road, she stated that everything "I had is still in that camper.   I have never went back to get anything."

{¶ 18}   The following exchange occurred:

Q. * * * And you've indicated that there was some sort of argument between you and Mr. Cressel and that there was something about him opening up the hood several times.   Do you remember testifying about that?

A.   Yeah.

Q.   And you indicated today that - - that happened three times?

A.   Yeah.

Q.   And do you remember meeting with Officer Dilley on - - on this date, April 21st?

A. On Warner Avenue. Yeah.

Q. * * * And do you remember telling Officer Dilley that this happened, this opening and closing of the hood, actually happened 10 times?

A. I don't know. Maybe I exaggerated. It happened three times. Three or four times.

Q. I - - that's your testimony today. I understand that, but according to Officer Dilley, it was - - you indicated it was ten times. So I'm just trying to figure out, was it ten times or was it three times?

A. I don't know.

Q. And you indicated earlier that - - that this argument, you had no idea what it was about?

A. No. Allen had a very bad temper. He gets mad about anything.

{¶ 19} Kristy stated that she does not make any money outside of the scrapping business, and "the only money I got was from my uncle, if it was not from there." She stated that she did not remember where the truck was parked at the Valero station. When asked if she entered the store to buy a beer, Kristy stated that she already "had the beer."

{¶ 20} The following exchange occurred regarding Kristy's previous statements and the reason Kristy and Cressel were in Dayton on the date of the incident:

Q. * * * You remember giving some written statements in this case?

A. Yeah.

Q. And do you remember meeting with Detective Via the next day?

A.  Uh-huh.

Q. * * * And do you remember giving a written statement to Officer Dilley?

A.  I don't really recall that. I - - everything happened.  It's all a haze.

Q.  I understand that, but do you remember Officer Dilley handing you some documents - -

A.  I remember - -

Q.  - - that you might have wrote on?

A.  Yeah.

Q. * * * Have you seen any of those statements before your testimony here today?

A.  No.

Q. * * * And do you remember testifying at a previous hearing in this case?

A.  Yes.

Q.   Now, Ms. [Kristy], can you tell me what it is you were going to Dayton for?   What - - what were you coming to Dayton for?

A.  I don't recall. I - -

Q.  You don't remember?

A.  No.

Q. * * * would it refresh your recollection if I

showed    you    your    written    statement?

A.  It might.

* * *

Q.  Now after having the opportunity to - -   to read that, let me ask you this.  Is that a written statement that you provided to Detective Via?

A.  I believe.

* * *

Q. * * * And, now after reading that - - that line that I showed you to - - that I pointed to you, does it refresh your recollection of why you're   - - you were coming to Dayton?

A.  No.

Q.  It doesn't?

A.  Nope.

Q. * * * Why don't you read that - - that sentence I just showed you, then?

A.  It says - -

MS. MADZEY:   Objection.

THE WITNESS:   - - we were coming to visit Allen's sister.

THE COURT: Just a minute, ma'am.  Just a minute. When there's objection, just wait.

Sustained.

BY MR. PENICK:

Q. * * * Let me ask the question this way. He told Detective Via that you - - you were coming - -

MS. MADZEY: Objection. She doesn't recall, Your Honor.

THE COURT: She says she doesn't recall. It doesn't refresh her recollection, so.

MR. PENICK: Sure, Your Honor. We're in a little impeachment right here. She gave the statement. She remembers giving it.

THE COURT: This is not impeachment. She says she doesn't recall. She's not saying she didn't make it. She doesn't recall. So it's not impeachment.

MR. PENICK: May we approach Your Honor?

THE COURT: No, we don't need to.

Q. So you have no idea why you were going to - - coming to Dayton?

A. I don't recall, no.

(Pause in proceedings)

Q. And at the previous hearing that was held in this case, you recall telling the judge in that case, I was going to see my brother.

THE COURT: Counsel, approach, please.

* * *

(At sidebar)

THE COURT: If you want to get into it, you got to do it the right way. I'm not going to have you bringing up prior statements. You can ask her if she recalls. You can use that to refresh her memory, but I'm not going to allow you to stand up here and use the prior statements.

MR. PENICK: This is a statement given

at a hearing. I

can't impeach her

with this?

THE COURT: You can impeach her, but ask her first if she recalls - - show it to her, whether or not it refreshes her recollection.

MR.PENICK: And then she's going to do it and then you're going to say - -

THE COURT: Well, she may or may not. Let's see what she says first. Let's take her through the steps first and since that's under oath, it is a little bit different than the other statement. Let's go through the right steps first.

* * *

(End sidebar)

Q. If I could direct your attention to these couple of lines right here.

A. Uh-huh.

* * *

Q. And after reviewing that, does it refresh your recollection of why

you were coming to Dayton?

A. I do not recall why were coming to Dayton.

Q. Okay. But under oath you said - -

MS. MADZEY: Objection Your Honor. I'm not - - and I'm not sure why this is relevant. She's indicated she doesn't remember, and I'm not sure why it's relevant who they were coming to see or why they were coming to Dayton.

THE COURT: Lay your foundation first, Mr. Penick.

MR. PENICK: That - - that's actually what I'm doing.

THE COURT: Well, you - - you went right to it. Lay your foundation first.

* * *

MR. PENICK: You gave testimony, you remember doing that, right?

A. Yeah.

* * *

Q. You remember you were under oath at that time, right?

A. Right.

* * *

Q. So if you told the Judge, I was going to see my brother, who lives on Ray Street, that was truthful at the time, wasn't it?

A. Right.

Q. * * * Now, would you agree with me, that the testimony that you

gave at that hearing is different from the statement you gave Detective Via?

A.   Yeah, it is.   I agree with that.

Q.   At - - at a hearing under oath, you say you're coming to see your brother, right?

A.   Right.

Q.   A little different from what you told Detective Via, wasn't it?

MS.MADZEY: Objection.   Asked and answered.

THE COURT: Sustained.

BY MR. PENICK:

Q. So let me ask you, which   - - which version is true - -

A.   I was   - -

Q.   - - the written statement or the   - this - - the testimony you gave under oath?

A.   I was going to see my brother is why I was coming down to Dayton.

Q. * * * And that's what your position is now, right?

A.   Right.

Q.   Now, when you gave the written statement to Detective Via, it was on April the 22nd, 2013, right?

A.   Right.

* * *

Q.   And then the hearing was held on May 6th; do you recall that?

A.   Somewhat, yeah.

{¶ 21}   When asked if she remembered an altercation occurring between her, two females and another male, shortly before the incident with Cressel, Kristy responded that she did not recall the incident nor discussing it with Via in the course of her interview.   She stated that she has used the Ray Street address as her mailing address for years, "as long as I can remember I've used it. I've always used it."   She stated that when Officer Dilley responded to Warner Avenue, she was with her aunt and uncle, Joe Walker and Connie Walker.   Kristy stated that when she jumped onto the hood of the car, she "almost did get [Cressel's] hand."   On redirect examination, Kristy stated that the camper in the car lot did not have an address.

{¶ 22}   Henry Joe Walker testified that he is Kristy's uncle, and that she and Cressel lived together for eight or nine months.   Walker stated that he "used to go to where they lived two to three times a week, took them out to eat - -."   Walker stated that Kristy and Cressel initially lived in a motor home on "the corner of Frederick and Needmore Road," in the parking lot of L & H Motor Sales.   Walker stated that Cressel "was the security guard * * * for the car lot."   According to Walker, Kristy and Cressel worked together, and they would "go out in the truck and collect skids and barrels and anything they could to make some money."   Walker stated that he gave Kristy and Cressel odd jobs and gave them money.   He stated that Kristy and Cressel later "moved into a pull-type trailer. * * * It was smaller than the motor home."   Walker stated that the smaller camper was moved to Cressel's father's home on Hemple Road.   Walker stated that at the time of the incident, Kristy and Cressel had been living on Hemple Road for approximately three weeks. Walker stated that he visited the couple three or four times, and that if he needed to find Kristy, he went to "the little trailer."

{¶ 23} Walker stated that Cressel initially used an old Ford pickup truck for transportation, and that "it backfired and caught on fire, and he had to get a carburetor." Walker stated that he "had the carburetor rebuilt and paid for it" for Cressel. In the meantime, he stated that he loaned the couple his 1984 El Camino pickup truck. Walker stated that on the day of the incident, he received a call from Kristy "around noon," and that he subsequently proceeded to the Valero gas station. When he arrived, Walker testified, Kristy was not there. He stated that he received another call from her, and that he subsequently proceeded to Warner Street to meet her. According to Walker, Kristy "was in shambles. She had a black eye," and she "was scared to death." Walker stated that the police responded to Warner Street and Kristy provided a statement.

{¶ 24} After the State rested, William McReynolds testified that he is a Dayton Police Officer, and that on April 4, 2013, he came into contact with Kristy while on routine patrol, and in the course of that contact, he "found that her address was [on] Ray Street." McReynolds stated that he recorded the information. On cross-examination, McReynolds stated that he did not ask Kristy if she lived at the Ray Street address or if she slept there every night. McReynolds indicated that he asked Kristy for her address so that he would know how to reach her if he needed to mail something to her.

{¶ 25} Allen Tyrone Cressel ("Cressel's father") testified that he resides at 6121 Hemple Road, and that Cressel is his son. He stated that in the month preceding April 21, 2013, there was a camper on his property. Cressel's father stated that Cressel brought the camper to his property, and that Cressel "said he was going to store his stuff in it because he had to move it from somewhere else and he said he was going to get an apartment." Cressel's father stated that

"[e]very now and then" Cressel "stayed back there" in the camper. According to Cressel's father, maybe "three times a week, I've seen him go back there. He hauls scrap metal and he would go back there and clean some metal and then he'd go back out and then I wouldn't see him again for a couple more days." When asked about his relationship with Cressel, Cressel's father stated, "at times, we don't get along good. And sometimes we get along a little bit." Cressel's father stated that he met Kristy "two or three times. She was driving my son's truck." Cressel's father stated that Kristy and Cressel were "[b]oyfriend and girlfriend." Cressel's father denied that Kristy would come into his house to see him or his girlfriend.

{¶ 26} The following exchange occurred:

Q. And if Mr. Cressel or anybody else was living in the camper in your backyard or on your property, would you be in a position to know whether they - - that was, in fact, happening?

A. If they was living back there, yeah.

Q. And were they? Was anybody living back there, to your knowledge?

A. Not that - - no, sir. Not - - I do know a couple times if they did stay back there because they left the next morning. They had - - they was either in that camper or in the truck.

Q. * * * Now how frequent were the - - how frequent was that?

A. The camper was back there for about six, seven weeks, maybe.

* * *

A. If I remember. I - - and they would come in, maybe ten, 12 times.

{¶ 27} On cross-examination, Cressel's father stated that Kimberly Abner is his

girlfriend, and that she resides with him. The following exchange occurred:

Q. * * * And you indicated for six to seven weeks, your son was staying out in a camper from time to time at the back of your property; is that right?

A. You know, I don't know if he was staying back there because me and him don't talk.

Q. * * * So you didn't hang out, right?

A. No.

Q. * * * But you knew he brought that camper out there; is that right?

* * *

A. My young brother wanted to store the camper back there.

* * *

A. And he - - he was going - -eventually, sell the camper and at that time, my son got homeless and   - - so I told him he could take the camper - - he had somewhere that he could take the camper and park it.

* * *

A. So he took it and then he called me and asked me if he could bring it out there and park it to keep his stuff in.

{¶ 28} Cressel's father stated that occasionally when Cressel arrived at the camper, "I didn't know he had anybody with him because he would be driving." Cressel's father stated that he goes to bed at 8:30 or 9:00 p.m., whereas Cressel is a "late person." Cressel's father stated that a "[l]ot of time," Cressel could come in late at night without Cressel's father's knowledge, and he acknowledged that Kristy could have been with Cressel. When asked if he remains on his

property all day, he replied, "No, I can't stand that."

{¶ 29} Finally, Nathan Via testified that he has been employed with the Dayton Police Department for almost 17 years. He stated that he interviewed Kristy on April 22, 2013 as the lead detective on the case. He stated that Kristy provided him with a written statement. Via stated that he learned of Cressel's prior convictions in the course of his investigation and that Cressel was subsequently charged and taken into custody. Via stated that after talking to Kristy, he determined that the incident occurred "around 1:00 in the afternoon." Via identified Kristy's written statement from April 22, 2013. When asked what he learned was the purpose of Kristy's trip to Dayton on the day of the incident, Via replied, "[s]he came to visit Allen's sister, according to the statement." Via acknowledged that at the preliminary hearing in May, 2013, Kristy testified that she had come to Dayton to visit her brother on Ray Street, which he further acknowledged is near the Valero gas station and Warren Street. Via stated that he represented to Cressel in the course of his interview with him that there were three witnesses to the incident, and he acknowledged that in fact there "were no witnesses." Via stated that he also represented to Cressel that he had obtained a video of the incident, and he testified that in fact there is no video of the incident.

{¶ 30} Via stated that he retrieved surveillance footage from the Valero gas station, and that there "were a total of six screens from different cameras. They (sic) were huge gaps in certain locations of those screens; there was nothing of evidentiary value." According to Via, there is "a huge gap to the one side of the building, an absolutely huge gap that goes all the way out to the street." Via stated that the 911 calls were not retrieved, and that no one attempted to obtain witness statements at the gas station since, "[d]ue to the extreme differences in time, there

would have been no reason for it."

{¶ 31} On cross-examination, Via stated that he has spent 12 years with the Special Victims Unit investigating domestic violence complaints, and that he has handled almost 10,000 cases. Via identified photographs that he took of Kristy in the course of his interview with her depicting a black eye and bruising on her arm, and he stated that the photos are "[a]ll consistent with her statements" regarding what happened to her. Via stated that the photos accurately depict the injuries that he observed.

{¶ 32} On redirect examination, the following exchange occurred:

Q. Those photographs depicting some injuries. Now, sir, do you have any specialized knowledge that would enable you to identify the exact time that an injury was sustained by a person?

A. Exact time?

Q. Yes.

A. No, sir.

Q. Now, during your investigation of this particular case, you had learned that there was an altercation that Ms. [Kristy] was involved in - -

MR. MADZY: Objection, Your Honor.

THE COURT: Go ahead and finish your question.

BY MR. PENICK:

Q. You learned about an altercation that Ms. [Kristy] was involved in near the time of this incident?

MS. MADZY: I'm going to object to the characterization and there's no

facts in evidence.

THE COURT: Why don't you rephrase the question?

BY MR. PENICK: You learned about - - that she was involved in an altercation, a dispute?

A.   A dispute, yes.

Q.   With some - - two females and a male?

Why are you looking at the prosecutor?

A.   I'm waiting to see if she's going to object.

Q.   Okay.   Sir, it's my question. If she's going to object, she's going to object.

So my question to you, two females and a male?

Is she going to answer the question for you?

A.   I'm trying to figure out what your question is.   I've already asked - - answered one of your questions - -

* * *

A. - - and I think you're asking it twice, so please go forward.

Q.   Two females involved in this dispute, two females and a male, right?

A.   In a verbal dispute.

Q.   And you spoke to Ms. [Kristy] about this, didn't you?

A.    Yes.

Q. * * * And you - - it was acknowledged that there was a dispute, right?

A.   A verbal - -

MS. MADZEY: Objection, Your Honor.

THE COURT: Sustained now.

BY MR. PENICK:

Q. No, there's not a lot that happened, is there?

THE COURT: Sustained.

BY MR. PENICK:

Q. Again, I'm over here. Okay.

Did she appear to be surprised when you talked to her about that?

A. No.

Q. And that dispute, whatever we're going to call it, happened near the time that this - - this alleged incident took place, right?

A. The day before, she said.

Q. Day before or the night before?

A. Day before.

MS. MADZEY: Your Honor, may we approach?

(At sidebar)

THE COURT: Just object.

MS. Madzey: I - - well, I didn't want to (indiscernible) objections. We're speaking objections, but this is beyond cross.

THE COURT: Your objection is sustained.

MR. PENICK: Well, she asked about (indiscernible), so I can get into it.

THE COURT: I gave you some leeway to get into it but, you know, that's going to be it, okay?

(End sidebar)

{¶ 33}   Finally, on  recross-examination, Via testified that Kristy never indicated to him that anyone other than Cressel caused her injuries.

{¶ 34}   Cressel asserts two assignments of error herein with subparts.  Cressel's first assigned error is as follows:

THE TRIAL COURT MADE ERRONEOUS EVIDENTIARY RULINGS WHICH DENIED APPELLANT HIS RIGHT TO A FAIR TRIAL.

A.   The Trial Court erred by not allowing Appellant to impeach the victim with her own prior inconsistent statements.

B.   The Trial Court erred by instructing the jury that [Kristy] was not impeached when in fact she was.

C.   The Trial Court erred when it did not allow Mr. Cressel to introduce evidence of [Kristy's] involvement in a prior altercation.

D.  The Trial Court erred in ruling that Mr. Cressel was not permitted to introduce evidence that [Kristy] is a prostitute to explain the nature of the relationship she had with Mr. Cressel.

**{¶ 35}**  As this court has previously noted, "[t]he admission or exclusion of relevant evidence rests within the sound discretion of the trial court and will not be disturbed absent an abuse of discretion. * * *."  *State v. Brown*, 2d Dist. Montgomery No. 21540, 2007-Ohio-2098, ¶ 24.  "Abuse of discretion" has been defined as an attitude that is unreasonable, arbitrary, or unconscionable. *Huffman v. Hair Surgeons, Inc.*, 19 Ohio St.3d 83, 482 N.E.2d 1248 (1985). A decision is unreasonable if there is no sound reasoning process that would support that decision. *AAAA Enterprises, Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 553 N.E.2d 597 (1990);  *Feldmiller v. Feldmiller,* 2d Dist. Montgomery No. 24989, 2012-Ohio-4621, ¶ 7.

**{¶ 36}**  Cressel initially asserts that "[Kristy] was claiming that she could not recall her own-handwritten statement she gave to Officer Dilley."  He asserts that defense counsel "was improperly precluded from introducing the statement for the purpose of impeaching [Kristy]."  Cressel asserts that "[n]ot allowing counsel to read [Kristy's] inconsistent statement  * * *  is in direct contradiction to [*State v. Reed*, 155 Ohio App.3d 435, 2003-Ohio-6536, 802 N.E.2d 862 (2d Dist.)] in which this Court stated that if the witness could not recall the content of her prior inconsistent statements, extrinsic evidence may be introduced."

**{¶ 37}**  In *Reed*, the Appellant was found guilty of murder, and after the shooting he told numerous people that he killed the victim. *Id.*, ¶ 4.  Witness Stacy Young, in the course of her cross-examination by defense counsel, was "asked whether she recalled questions by Detective

Eshelman during her first police interview and whether she remembered her answers to those questions. Young indicated that she recalled being asked whether other individuals had talked to her about the shooting and what Reed had said to her about it." *Id*., ¶ 31. She testified repeatedly, however, "that she did not remember her responses to many of those questions." *Id.* After noting that, pursuant to Evid.R. 613(B), "'a lack of recollection is treated the same as denial, and use of extrinsic impeachment evidence is then permitted,'" this Court determined that "Young's lack of memory regarding her first interview laid a foundation for the admission of extrinsic evidence, such as the testimony of Detective Eshelman, regarding her prior statements." *Id*., ¶ 30-31(citation omitted).

{¶ 38} Evid. R. 613 governs impeachment by self-contradiction, and section (B) provides as follows:

(B) Extrinsic evidence of prior inconsistent statement of witness. Extrinsic evidence of a prior inconsistent statement by a witness is admissible if both of the following apply:

(1) If the statement is offered solely for the purpose of impeaching the witness, the witness is afforded a prior opportunity to explain or deny the statement and the opposite party is afforded an opportunity to interrogate the witness on the statement or the interests of justice otherwise require;

(2) The subject matter of the statement is one of the following:

(a) A fact that is of consequence to the determination of the action other than the credibility of a witness;

(b) A fact that may be shown by extrinsic evidence under Evid.R.

608(A), 609, 616(A), or 616(B);

(c) A fact that may be shown by extrinsic evidence under the common law of impeachment if not in conflict with the Rules of Evidence.

{¶ 39} We agree with the State that Kristy's "inability to recollect the prior statement is a denial of it," pursuant to *Reed.* However, the statement regarding Kristy's purpose in coming to Dayton on the date of the incident, as the State asserts, "is collateral to a determination of whether Cressel committed domestic violence." In other words, the statement is not admissible pursuant to Evid. R. 613(B)(2)(a), or otherwise under the rule. Finally, we disagree with Cressel's assertion that he was "denied the opportunity to effectively" cross-examine Kristy; in the course of the lengthy exchange quoted above, Kristy clearly acknowledged that the written statement that she provided to Via on April 22, 2013 differed from the testimony that she gave under oath at the preliminary hearing on May 6, 2013, regarding her purpose in coming to Dayton. Finally, we note that the inconsistency in her statements was further highlighted in the course of Via's testimony.

{¶ 40} Cressel next asserts that the "trial court's evidentiary ruling further prejudiced Mr. Cressel because the court, even if inadvertently, instructed the jury that prior inconsistent statements from [Kristy] were not considered. This denied Mr. Cressel his right to a fair trial." According to Cressel, the entire case against him "was comprised solely from testimony of [Kristy], coupled with the fact that essentially all of [Kristy's] allegations were inconsistent and/or conflicting with her prior statements * * *." Cressel asserts that his "defense was based on the fact that [Kristy] was not truthful and that her story could not be believed," and it "is simply not reasonable for any fact finder to find [Kristy] credible absent the trial judge making that statement

to the jury. Otherwise, the jury would not have, and could not have, found Mr. Cressel guilty based on [Kristy's] testimony."

{¶ 41} We agree with the State that the court's ruling regarding Kristy's written statement to Via was not an instruction to the jury that somehow bolstered her credibility. As noted above, after the court sustained the State's objection to defense counsel's request that Kristy read from her statement to Via, defense counsel adduced evidence from Kristy (and Via) that her written statement to Via and her testimony at the preliminary hearing were inconsistent (regarding an issue immaterial to Cressel's guilt).

{¶ 42} Cressel next asserts that the trial court erred when it did not allow him to introduce evidence that Kristy was involved in an altercation before the incident, and that the court "essentially barred him from a defense that may have shown another cause of [Kristy's] injury." Cressel asserts that had defense counsel "been permitted to dig deeper into that issue with Detective Via, he would have been able to clearly show the jury that the altercation was not a 'verbal' altercation, but a physical one." The State responds that "the trial court properly decided that further questioning of Detective Via was outside the scope of cross-examination," and that "even if Cressel's questioning of Detective Via was not outside the scope of cross-examination, no prejudice resulted from sustaining the State's objection."

{¶ 43} "As a general rule, the scope of redirect examination is limited to matters inquired into by the adverse party on cross-examination. *Holtz v. Dick* (1884), 42 Ohio St. 23, syllabus." *State v. Thompson*, 12th Dist. Butler No. CA94-07-147, 1995 WL 295253, * 3 (May 15, 1995).

{¶ 44} Defense counsel sought to establish in his direct examination of Via that Kristy was not credible, in that she gave inconsistent statements about the purpose of her trip to Dayton,

and that Via misrepresented to Cressel that there were witnesses to and videotape of the incident, when in fact no such evidence against him existed. On cross-examination, the State adduced testimony from Via that Kristy's injuries were consistent with her statements regarding Cressel's conduct in assaulting her. While defense counsel could have examined Via regarding the alleged prior altercation in his direct examination, he failed to do so, and as the State asserts, introduction of the topic in redirect examination exceeds the scope of the State's cross-examination. Finally, even if the trial court did abuse its discretion in sustaining the State's objection, prejudice is not demonstrated. Defense counsel adduced testimony from Via that he learned that Kristy was involved in a "*verbal* dispute" with two females and a male the day before the incident, and that he discussed the dispute with Kristy. We cannot agree with Cressel that if he had been allowed to "dig deeper" he "would have been able to clearly show the jury that the altercation was not a 'verbal' altercation, but a physical one."

{¶ 45}  Finally, Cressel asserts that the "trial court erred in ruling that Mr. Cressel was not permitted to introduce evidence that [Kristy] is a prostitute to explain the nature of the relationship she had with Mr. Cressel." The State responds that "finality did not attach to  the trial court's in limine ruling," and that Cressel's argument lacks merit.

{¶ 46}  In *State v. Baker*, 170 Ohio App.3d 331, 2006-Ohio-7085, 867 N.E.2d 426 (2d Dist.), this Court noted as follows:

> "[A] decision on a motion in limine is a pretrial, preliminary, anticipatory
>
> ruling on the admissibility of evidence. A ruling on a motion in limine is
>
> interlocutory, usually dealing with the potential admissibility of evidence at trial. It
>
> therefore cannot serve as the basis for an assignment of error on appeal." *Krotine v.*

*Neer*, Franklin App. No. 02AP–121, 2002-Ohio-7019, 2002 WL 31838301, at ¶ 10, citing *State v. Grubb* (1986), 28 Ohio St.3d 199, 201–202, 28 OBR 285, 503 N.E.2d 142. A ruling on a motion in limine reflects the court's "anticipatory treatment of the evidentiary issue. In virtually all circumstances finality does not attach when the motion is granted. Therefore, should circumstances subsequently develop at trial, the trial court is certainly at liberty 'to consider the admissibility of the disputed evidence in its actual context.' " *Grubb* at 201–202, 28 OBR 285, 503 N.E.2d 142, quoting *State v. White* (1982), 6 Ohio App.3d 1, 4, 6 OBR 23, 451 N.E.2d 533. For those reasons, a motion in limine does not preserve for purposes of appeal any error in the disposition of the motion in limine. " 'An appellate court need not review the propriety of such an order unless the claimed error is preserved by a timely objection when the issue is actually reached during the trial.' " *Grubb* at 203, 28 OBR 285, 503 N.E.2d 142, quoting *State v. Leslie* (1984), 14 Ohio App.3d 343, 344, 14 OBR 410, 471 N.E.2d 503. The failure to object at trial to the allegedly inadmissible evidence constitutes a waiver of the challenge. *State v. Wilson* (1982), 8 Ohio App.3d 216, 8 OBR 288, 456 N.E.2d 1287; *State v. Draughon*, 10th Dist.No. 02AP–958, 2003-Ohio-1705, 2003 WL 1757232, ¶ 22.

**{¶ 47}** The trial court initially advised counsel for Cressel that "I'm making it clear for you on the record that you're not waiving that objection," but then the court subsequently advised defense counsel to "please ask to approach" at the appropriate time to renew his objection. If we assume, based upon the trial court's initial representation to defense counsel that "[y]ou have made your objection," such that the issue of Kristy's conviction is arguably preserved, we

conclude that Cressel's argument lacks merit.

{¶ 48} Evid.R. 609 governs impeachment by evidence of conviction of a crime and provides as follows:

(A) General rule

For the purpose of attacking the credibility of a witness:

(1) subject to Evid.R. 403, evidence that a witness other than the accused has been convicted of a crime is admissible if the crime was punishable by death or imprisonment in excess of one year pursuant to the law under which the witness was convicted.

(2) notwithstanding Evid.R. 403(A), but subject to Evid.R. 403(B), evidence that the accused has been convicted of a crime is admissible if the crime was punishable by death or imprisonment in excess of one year pursuant to the law under which the accused was convicted and if the court determines that the probative value of the evidence outweighs the danger of unfair prejudice, of confusion of the issues, or of misleading the jury.

(3) notwithstanding Evid.R. 403(A), but subject to Evid.R. 403(B), evidence that any witness, including an accused, has been convicted of a crime is admissible if the crime involved dishonesty or false statement, regardless of the punishment and whether based upon state or federal statute or local ordinance.

{¶ 49} On May 3, 2008, Kristy pled guilty to solicitation, in violation of R.C. 2907.24(A)(1), in Dayton Municipal Court. R.C. 2907.24 (A)(1) provides that "[n]o person shall solicit another who is eighteen years of age or older to engage with such other person in

sexual activity for hire." The offense is a misdemeanor of the third degree. R.C. 2907.24(C). The penalty for the conviction is neither death nor imprisonment for over one year, and dishonesty or false statement are not elements of the offense. Accordingly, the trial court did not err in granting the state's motion in limine.

{¶ 50} Since an abuse of discretion is not demonstrated, Cressel's first assigned error is overruled.

{¶ 51} Cressel's second assigned error is as follows:

THE EVIDENCE INTRODUCED AT TRIAL WAS SO INCREDIBLE THAT APPELLANT'S CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

1. [Kristy's] testimony conflicted with Officer Dilley's.

2. [Kristy's] testimony conflicted with her own testimony and prior statements.

3. [Kristy's] testimony conflicted with Mr. Walker's.

4. [Kristy's] testimony conflicted with Officer McReynolds'.

[5.] [Kristy's] testimony conflicted with Mr. Cressel, Sr.'s.

[6.] [Kristy's] testimony conflicted with Detective Via's.

{¶ 52} As this Court has noted:

"[A] weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, 2009 WL 282079, ¶ 12. *See Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 19 (" 'manifest weight of the

evidence' refers to a greater amount of credible evidence and relates to persuasion"). When evaluating whether a conviction is contrary to the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997). However, we may determine which of several competing inferences suggested by the evidence should be preferred. *Id*. The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence. *Wilson* at ¶ 14. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin*, 20 Ohio App.3d at 175, 485 N.E.2d 717.

S*tate v. Hudson*, 2d Dist. Clark No. 2011 CA 100, 2013-Ohio-2351, ¶ 40-41.

**{¶ 53}** R.C. 2919.25(A) provides: "No person shall knowingly cause or attempt to cause physical harm to a family or household member." "A person acts knowingly, regardless of his

purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B). Physical harm "means any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3). R.C. 2919.25(F) (1)(a)(i) provides that a family or household member means "[a] spouse, a person living as a spouse, or a former spouse of the offender." "'Person living as a spouse' means a person who is living or has lived with the offender in a common law marital relationship, who otherwise is cohabiting with the offender, or who otherwise has cohabited with the offender within five years prior to the date of the alleged commission of the act in question." R.C. 2919.25(F)(2).

{¶ 54} Having thoroughly reviewed the entire record, and deferring to the jurors' decisions regarding whether and to what extent to credit the testimony of the witnesses, we cannot conclude that Cressel's conviction is against the manifest weight of the evidence. Dilley testified that Kristy and Cressel resided together, first in Harrison Township and then in Miamisburg. Dilley stated that Kristy told him that Cressel punched her in the eye, that she was crying when he arrived, and that he observed a purple, raised bruise beneath her eye. Dilley identified a photograph taken by him depicting Kristy's injury. Kristy testified that she and Cressel resided together in an intimate relationship, and that she spent every night with Cressel. She described their routine and living arrangement in detail. Kristy testified that she uses the Ray Street address as her mailing address only, and that the camper in the car lot did not have an address. Kristy testified that Cressel punched her in the eye with a closed fist and grabbed her arm, leaving bruises that lasted several days. Walker also testified that Cressel and Kristy resided together, first in the camper at the car lot, and then in a smaller camper on Hemple Road. Walker visited them often,

according to his testimony. Walker stated that if he needed to find Kristy, he went to "the little trailer." Walker's testimony was consistent with Dilley's regarding Kristy's condition when he arrived at Warner Street.

{¶ 55} While McReynolds testified that Kristy provided the Ray Street address to him in the course of his contact with her, he acknowledged that he did not ask her if she lived there, and that he asked for her address to enable him to contact her by mail. Cressel's father's testimony was inconsistent in that he initially denied that any one was living in the camper on his property, and then he stated that he did not know if Cressel "was staying back there because me and him don't talk." He stated that he and Cressel kept different hours, and he acknowledged that Cressel and Kristy were "boyfriend and girlfriend." Finally, Via, an experienced detective, identified photographs taken by him depicting Kristy's black eye as well as bruising on her right arm, and he testified that the photos reflect injuries consistent with Kristy's statements about Cressel's conduct in assaulting her. Via stated that Kristy never indicated to him that anyone other than Cressel caused her injuries.

{¶ 56} While Cressel asserts that Kristy is not credible, and that there are numerous inconsistencies within her own testimony and between her testimony and that of the other witnesses, the jury was free to believe the evidence presented that Kristy and Cressel resided together, and that Cressel grabbed her arm and punched her in the eye. In other words, the jury was free to credit the evidence presented that Cressel knowingly caused physical harm to a household member, in violation of R.C. 2919.25(A). Since we cannot conclude that Cressel's judgment of conviction should be reversed and a new trial ordered, his second assigned error is overruled. The judgment of the trial court is affirmed.

. . . . . . . . . .

FROELICH, P.J. and HALL, J., concur.

Copies mailed to:

April F. Campbell
Bryan K. Penick
Hon. Dennis J. Adkins